IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

LEDO PIZZA SYSTEM, INC.,　*
et al.,
　　　　　　　　　　　　　　　*
　　　　Plaintiffs,　　　　*

　　　　v.　　　　　　　　　*　　CIVIL NO.: WDQ-13-2365

INDERJIT SINGH, et al.,　*

　　　　Defendants.　　　　*

\* \* \* \* \* \* \* \* \* \* \* \* \*

MEMORANDUM OPINION

Ledo Pizza System, Inc. and Ledo Pizza Carryouts, Ltd. (collectively "Ledo") sued Defendants Tri-Bro, Inc. ("Tri-Bro") and Inderjit Singh for violations of the Lanham Act, and other claims. ECF No. 1. Pending is Ledo's motion for a temporary restraining order and preliminary injunction. ECF No. 2-1. No hearing is necessary on the motion for a temporary restraining order ("TRO"). See Local Rule 105.6 (D. Md. 2012). For the following reasons, Ledo's motion for a TRO will be granted in part and denied in part.

I.　Background[1]

On June 8, 2007, Ledo and the defendants signed a franchise agreement, which authorized the defendants to operate a Ledo

---

[1] The facts are taken from the complaint, (ECF No. 1), amended complaint, (ECF No. 4), their supporting documents, the motion, (ECF No. 2-1), and the August 26, 2013 letter of counsel for Tri-Bro, (ECF No. 10).

pizza restaurant in Lorton, Virginia. ECF No. 2-1 at 2. Beginning in 2010, the defendants defaulted on several of their obligations under the agreement. *Id.* at 3. According to Ledo, the defendants now owe Ledo tens of thousands of dollars in overdue franchise and other fees. ECF No. 4 at 9 ¶47. On May 14, 2012, Ledo terminated the franchise agreement. ECF No. 2-1 at 3.

On May 31, 2012, Ledo and the defendants entered into a forbearance agreement. ECF No. 2-1 at 4. Under this agreement, Ledo refrained from exercising its post-termination rights under the franchise agreement, to give the defendants an opportunity to sell the franchise or dispose of its assets. ECF No. 2-1 at 4-5. Although this agreement expired in November 1, 2012, ECF No. 2-8 at 2, Ledo agreed in June 2013 to extend the forbearance period to July 31, 2013. ECF No. 2-1 at 5.[2] Ledo contends that the defendants continued to operate the franchise following the termination of the franchise agreement and after the forbearance periods. *Id.*

On August 14, 2013--two weeks after the extended forbearance period--Ledo moved for a TRO and a preliminary injunction. ECF No. 2-1. The motion seeks to enjoin the

---

[2] Neither the motion nor the complaint explains the reason for the long gap between the expiration of the first forbearance agreement and the agreement extending the forbearance period.

defendants from the continued use of Ledo's trademark and trade dress, allegedly in violation of the Lanham Act and Ledo's common law trademark rights. *Id.* at 6.

Ledo also seeks the defendants' compliance with the post-termination obligations in the franchise agreement, *id.* at 8,[3] and the agreement's covenant-not-to-compete, *id.* at 12-13.[4]

The amended complaint seeks a permanent injunction, *see e.g.*, ECF No. 4 at 17, and specific performance, ECF No. 4 at 12-15. Ledo also requests damages for breach of contract[5] and

---

[3] The agreement states that the obligations arise "[u]pon termination or expiration of the franchise for any reason whatsoever." ECF No. 2-1 at 8. These obligations, which require affirmative acts, include, *inter alia*, returning all copies of Ledo's operating manuals, assigning the restaurant's phone numbers to Ledo, and modifying the interior of the restaurant to no longer reflect the color schemes or physical appearance of Ledo restaurants. *Id.* at 9. According to Ledo, the defendants have yet to comply with any of these post-termination obligations. *See* ECF No. 4 at 13.

[4] The covenant is effective upon Ledo's termination of the franchise agreement, whether or not that termination occurs in accordance with the agreement. *See* ECF No. 2-1 at 13. The covenant prohibits the defendants from engaging in "any dine in or carry-out food products business" within ten miles of any Ledo pizza restaurant for a period of two years. *Id.* Ledo asserts that, by continuing to operate following termination of the franchise agreement, the defendants have breached this covenant. *See id.* at 14.

[5] The complaint asserts that the defendants owe several thousand dollars in unpaid advertising and royalty fees and outstanding invoices under the franchise agreement. ECF No. 4 at 9 ¶47. The complaint also asserts that the defendants owe $100,000 in liquidated damages for breach of the covenant-not-to-compete. *Id.* at 11 ¶59.

costs and attorneys' fees against defendant Singh only, because Tri-Bro had declared bankruptcy.[6] *See id.* at 2 ¶6, 12.

Both Defendants were served on August 19, 2013. ECF No. 7; ECF No. 8. The parties held a telephone conference on August 22, 2013, during which counsel for Tri-Bro confirmed that the company had filed for Chapter 11 Bankruptcy protection. Counsel for both defendants were instructed to file their responses to Ledo's motion by mid-day August 26, 2013. Only Tri-Bro's counsel responded and, by letter, declined to file a response to the motion because Ledo no longer sought damages against it. ECF No. 10. On August 30, 2013, the parties jointly stipulated to entry of a consent order that would have given the defendants 30 days to wind down the business, after which the Court would order dismissal of the action or grant injunctive relief depending on whether the defendants complied with the agreement. *See* ECF No. 11 at 6-9. On September 4, 2013, the Court informed the parties that, due to concerns that the defendants would not have sufficient time to wind down the business, it would not enter the consent order. ECF No. 12. Instead, the Court would treat the consent order as a tentative settlement and request to

---

[6] The complaint asserts that the franchise agreement requires the defendants to pay Ledo's costs and attorney's fees, "incurred in any action brought to enforce the Franchise Agreement." ECF No. 4 at 11 ¶60. The complaint seeks attorneys' fees for all the claims. *See, e.g.*, ECF No. 4 at 16-17 ¶91.

4

stay the litigation. *Id.* On October 7, 2013, Ledo renewed its request for injunctive relief, because the defendants did not comply with the terms of the consent order.[7] ECF No. 13 at 5.

II. Analysis

    A. Bankruptcy Filing

Although Tri-Bro has filed for bankruptcy, Ledo seeks injunctive relief against it. ECF No. 4 at 2. Under 11 U.S.C. § 362, a bankruptcy petition "operates as a stay . . . of . . . the commencement or continuation . . . of a judicial . . . action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy proceeding.]" § 362(a)(1). The plain text of the statute suggests that the automatic stay provision applies to suits for equitable relief. *See id.* In *Advanced Computer Servs. of Michigan, Inc. v. MAI Sys. Corp.*, 161 B.R. 771, 772, 774 (E.D. Va. 1993),[8] the plaintiffs sought declaratory and injunctive relief after the defendant filed for bankruptcy. The court held that the § 362 "automatic stay bars claims for declaratory and

---

[7] Ledo also requested "that a Default Judgment be entered against the Defendants," because they have not yet answered the Amended Complaint. ECF No. 13 at 5. However, no default has been entered as to the defendants. Thus, entry of a default judgment at this time is not warranted. *See F.D.I.C. v. Danzig*, 10 F.3d 806, at *2 n.5 (4th Cir. 1993).

[8] The *Advanced Computer* court noted that the question of the effect of the automatic stay on the availability of injunctive and declaratory relief is "seldom-litigated." *Id.* at 773.

5

injunctive relief, as well as claims for monetary relief and that the stay also bars claims based on conduct that commenced pre-petition and continues into the post-petition period." *Id.* at 772.[9]

Ledo's amended complaint states that Tri-Bro filed for bankruptcy on May 20, 2013. ECF No. 4-1 at 2. Ledo contends that the basis for Ledo's motion for injunctive relief is conduct before, and after, Tri-Bro's bankruptcy filing. *See, e.g.*, ECF 4-1 at 5, 8. Because Ledo seeks injunctive relief against Tri-Bro for behavior that arose before and after the petition was filed, the Court will reject Ledo's request for injunctive relief against Tri-Bro.[10]

---

[9] *See also In re Enron Corp.*, 314 B.R. 524, 533 (Bankr. S.D.N.Y. 2004) (stating, in the discussion of the applicability of § 362 to equitable relief, that "[t]he scope of the automatic stay is broad"); *Neighbors Law Firm, P.C. v. Highland Capital Mgmt., L.P.*, 5:09-CV-352-F, 2010 WL 5477260, at *1 (E.D.N.C. Dec. 28, 2010) (noting that the court held plaintiff's motion for preliminary injunction in abeyance "pending the resolution" of defendants' bankruptcy action).

[10] Accordingly, this opinion's references to the defendant, mean Defendant Singh individually. One court has held that § 362 does not stay actions for injunctive relief, because an injunction does not interfere with the policies behind the Bankruptcy Act but instead "correct[s] a continuing offense against the public interest." *See Brennan v. T & T Trucking, Inc.*, 396 F. Supp. 615, 617-18 (N.D. Okla. 1975). Given the plain language of the statute, however, the Court finds *Brennan* unpersuasive.

B. Preliminary Injunction Standard[11]

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal quotation marks omitted). Because a preliminary injunction "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way," "[t]he danger of a mistake in this setting is substantial." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (internal quotation marks omitted).

To obtain a preliminary injunction, the movant must demonstrate that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors him; and (4) an injunction is in the public interest.[12] The movant must show more than a "grave or serious question for litigation;" instead, he bears

---

[11] *See General Parts Dist., LLC v. St. Clair*, Civ. No. 11-3556-JFM 2011, WL 6296746, at *2 (D. Md. Dec. 14, 2011) (stating that the standards for a TRO and a preliminary injunction are the same).

[12] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371, *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam).

7

the "heavy burden" of making a "clear showing that [he] is likely to succeed at trial on the merits." *Real Truth*, 575 F.3d at 347, 351. All four elements must be satisfied. *Id.* at 346.

   C. Lanham Act Trademark Infringement

      1. Likelihood of Success on the Merits

To prevail on its Lanham Act claims, Ledo must show that it "has a valid, protect[a]ble trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 (4th Cir. 1995) (*citing* 15 USC § 1141(1)). In a directly analogous case involving a terminated pizza franchise agreement, the court held that a franchisee's continued use of a franchisor's trademarks following the termination of the agreement was likely to cause confusion among consumers. *See Prosperity Systems, Inc. v. Ali*, CIV. CCB-10-2024, 2010 WL 5174939, at *2 (D. Md. Dec. 15, 2010) (*citing Merry Maids Ltd. P'ship v. Kamara*, 33 F. Supp. 2d 443, 445 (D. Md. 1998)). In this context it is probable that consumers will be misled or confused "as to the source of the goods in question." *See Ohio Learning Ctrs., LLC v. Sylvan Learning, Inc.*, CIV.A. RDB-10-1932, 2012 WL 1067668, at *10 (D. Md. Mar. 27, 2012).[13]

---

[13] *See also Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992)("[A]n unauthorized use of a trademark

8

Ledo likely owns the trademark "Ledo Pizza."[14] Here, the defendant is using Ledo's actual trademark, not a "colorable imitation." ECF No. 4 at 8. The defendant's customers are likely to erroneously believe they are patronizing an authorized Ledo restaurant. Ledo has established its likelihood of success on the merits.

2. Irreparable Harm

Ledo argues that it has suffered irreparable harm from the defendant's infringement of its trademark rights. ECF No. 2-1 at 6-7. A finding of irreparable harm usually follows a finding of unlawful use of a trademark and a likelihood of confusion.[15]

---

infringes the trademark holder's rights if it is likely to confuse an 'ordinary consumer' as to the source or sponsorship of the goods.").

[14] Ledo alleges that it is "the owner of the federally registered trademark/servicemark Ledo Pizza® (USPTO Reg. Nos. 2712869 and 1760125)." ECF No. 2-1 at 2.

[15] See Prosperity Systems, 2010 WL 5174939, at *5; Merry Maids, 33 F. Supp. 2d at 445. In the franchise context, multiple cases note that the franchisor loses control of its business reputation when a terminated franchisee continues to operate its former franchise, and thus suffers irreparable harm. See Merry Maids, 33 F. Supp. 2d at 445 (citing Long John Silver's, Inc. v. Washington Franchise, Inc., 1980 U.S. Dist. LEXIS 16635, at *12 (E.D. Va. June 24, 1980)). Irreparable harm may also arise in the franchise context "where there is an inherent injury to the goodwill and reputation of the plaintiff" resulting from the "[v]iolation of a trademark." See NaturaLawn of Am., Inc. v. W. Grp., LLC, 484 F. Supp. 2d 392, 401 (D. Md. 2007)(finding that former franchisees' continued use of the franchisor's trademark, trade secrets, and customer lists qualified as inherent injury).

Ledo asserts that the defendant's continued use of its trademark and trade dress, and his continued operation of a now-unauthorized Ledo pizza restaurant "undermine[s] the good will, reputation and loyal patronage" of Ledo. ECF No. 2-1 at 7. The defendant's customers erroneously believe that the defendant's restaurant is an authorized Ledo franchise, and expect that the restaurant will provide the quality of services and products received at authorized franchises. *See id.* at 7, 11-12. Ledo can no longer control the quality of products and services at the defendant's restaurant because of the termination of the franchise agreement. *Id.* at 11. Ledo also claims that the defendant's restaurant is diverting customers from authorized Ledo franchises, decreasing Ledo's profits. *Id.* This loss of control of the defendant's restaurant, the threat to Ledo's reputation and goodwill, and the ongoing loss of profits qualify as irreparable harm. *See, e.g., Merry Maids*, 33 F. Supp. 2d at 445.

3. Balance of Equities

Ledo argues that the balance of equities favors it, because "[t]he potential harm to the Defendants in granting [this motion] . . . is relatively minimal" compared to the harm Ledo will suffer by defendant's continued infringement. ECF No. 2-1 at 7. Although several analogous cases conclude that the balance of equities generally favors the franchisor, some of

these cases also recognized that the former franchisees suffer great harm from the closure of their businesses. *See NaturaLawn*, 484 F. Supp. 2d at 403; *Prosperity*, 2010 WL 5174939, at *5. However, when the defendant's "hardships have been created by their own willful acts," the balance favors the plaintiffs.[16]

Here, it is likely that the defendant will suffer serious economic harm from the closure of his restaurant, especially since the defendant is apparently attempting to find a buyer for the business or its assets. Nonetheless, the defendant's hardship appears self-inflicted. Ledo has produced numerous invoices sent to the defendant showing overdue balances which demonstrate that the defendant was on notice of likely termination of the franchise. ECF No. 2-5. The defendant also received several letters from Ledo requesting that he cease operating as a Ledo pizza restaurant following the termination. *See, e.g.*, ECF No. 1-5 at 2. Accordingly, the balance of equities tips in Ledo's favor, despite the economic hardship the defendant will likely suffer.

---

[16] *See NaturaLawn*, 484 F. Supp. 2d at 403; *Meineke Car Care Centers, Inc. v. Bica*, 3:11-CV-369-FDW-DCK, 2011 WL 4829420, at *4 (W.D.N.C. Oct. 12, 2011)(*citing S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 379 (3d Cir. 1992) ("[Franchisee] is certainly harmed by the threat of loss of his franchise, but his self-inflicted harm is far outweighed by the immeasurable damage done Jiffy Lube by the infringement of its trademark.")).

4. Public Interest

Ledo argues that the public "has a strong interest in the protection of trademarks," justifying the injunction. ECF No. 2-1 at 8. Several cases in this district emphasize the public interest in enforcement of trademark rights, particularly noting that the public has a strong interest in avoiding consumer confusion "'about the identity of the enterprise from which goods and services are purchased.'" *See Prosperity*, 2010 WL 5174939, at *6 (quoting *Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 594 (E.D. Va. 2008)); *Merry Maids*, 33 F. Supp. 2d at 446. Because Ledo seeks to protect its trademark rights, and so avoid consumer confusion, the public interest favors granting Ledo's requested relief. *See Merry Maids*, 33 F. Supp. 2d at 446.

5. Ledo's Other Trademark Claims

Ledo also asserts common law trademark infringement claims. *See* ECF No. 2-1 at 6-8. Because Ledo appears to satisfy the requirements for an injunction on its Lanham Act claims, granting this injunction, which prohibits further infringement of Ledo's trademark by the defendant, will also protect Ledo's common law trademark rights.

D. Contract Claims[17]

1. Likelihood of Success on the Merits

Ledo is likely to establish that: (1) Ledo and the defendant entered into a contract, the franchise agreement;[18] (2) the franchise agreement was terminated;[19] and (3) the agreement requires defendant's compliance with several post-termination obligations, including the covenant-not-to-compete.[20] As Ledo has failed to establish the requisite imminent irreparable harm for entitlement to immediate injunctive relief, the covenant-not-to-compete and other post-termination obligations will not be enforced now.

---

[17] Although the Court will not decide the merits of Ledo's breach of franchise claims now, Maryland law likely governs the enforceability and construction of the franchise agreement. The franchise agreement provides that, "this Agreement . . . is governed by the laws of the State of Maryland." ECF No. 1-2 at 32 ¶43. A federal court exercising diversity jurisdiction must apply the choice-of-law principles of the state in which the federal court is located. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Under Maryland law, this Court should presume that the parties' choice of law is enforceable. *See Meena Enters., Inc. v. Mail Boxes Etc.*, No. DKC 12-1360, 2012 WL 4863695, at *6 n.8 (D. Md. Oct. 11, 2012) (internal quotation marks omitted).

[18] *See* ECF No. 1-2.

[19] On May 11, 2012, Ledo sent a Notice of Termination letter to the defendants. ECF No. 1-5. This letter followed a Notice of Default letter which detailed the defendants' outstanding financial obligations to Ledo under the franchise agreement. ECF No. 1-4. The complaint claims that the defendants failed to pay these amounts owed. ECF No. 4 at 9 ¶47. Ledo has also verified the complaint. ECF No. 1-1.

[20] *See* ECF No. 2-1 at 8.

2.  Covenant-not-to-compete

Ledo asserts that defendant's continued operation of the franchise has caused irreparable harm. ECF No. 2-1 at 14-15. Ledo contends that the defendant's continued operation threatens Ledo's "good will and reputation," especially since any departure by the defendant from Ledo's standard quality of goods and services will be attributed to Ledo generally. *See id.* at 15. Ledo also contends that it will likely need two years to find a new franchisee for the area. *Id.* at 16. Finally, Ledo argues that "the ability of a franchisee to terminate a franchise agreement and continue to offer products and services similar to the franchisor is likely to send a clear signal to other franchisees that they can terminate their franchise agreements and continue to [offer] such products and services in essentially the same manner." *Id.* at 15.

Assuming the covenant-not-to-compete is enforceable under Maryland law, Ledo has not established sufficiently imminent irreparable harm that would entitle it to immediate enforcement of the covenant at this stage in the suit. Because the Court will grant Ledo's request for immediate injunctive relief on Ledo's trademark infringement claims, the defendant will be immediately barred from operating as a Ledo pizza restaurant.

Ledo has not shown that the defendant's potential violation of the covenant-not-to-compete will irreparably harm Ledo's

14

goodwill and reputation, or prevent Ledo from soliciting new franchisees, given that the defendant is prohibited from associating any future restaurant with the Ledo pizza brand. The injunctive relief the Court will grant will prohibit the defendant from offering "products and services in essentially the same manner" as it had before. Thus, Ledo has failed to show that immediate enforcement of the covenant-not-to-compete is necessary. See MicroStrategy, 245 F.3d at 339.[21]

3. Defendant's Post-Termination Obligations

a. Standard

Ledo seeks the defendant's compliance with several contractual obligations that arose out of the termination of the franchise agreement, many of which require the defendant's affirmative action.[22] "Ordinarily, preliminary injunctions are

---

[21] One court has held that the balance of equities favors the defendant franchisee when enforcement of the non-compete provision according to its terms will cause substantial harm to the defendant. Prosperity Systems, 2010 WL 5174939, at *5 (finding that substantial economic harm to franchisee resulting from prohibition against operating a pizza restaurant in his own name outweighed harm to franchisor, when defendant likely had established "his own good will with customers" after operating for many years).

[22] Ledo requests that the Court enjoin the defendant to:

    i. [Cease] operations as a food or related products carryout business for a period of two years at the Business premises;
    ii. [Return] all copies of the Ledo Pizza Operating Manual;

15

issued to protect the status quo and to prevent irreparable harm during the pendency of a lawsuit ultimately to preserve the court's ability to render a meaningful judgment on the merits." *Perry v. Judd*, 471 F. App'x 219, 223 (4th Cir. 2012) (internal quotation marks omitted). "[M]andatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." *Id.* (internal quotation marks omitted).

b. Irreparable Harm and Balance of Equities

Ledo recycles several arguments for defendant's immediate compliance with the post-termination obligations. Ledo again notes that defendant's continued operation of the business threatens its goodwill and profits and prevents it from controlling its reputation. ECF No. 2-1 at 11. Ledo does not,

---

iii. [Cancel] all assumed names or equivalent registrations relating to the use of any mark used pursuant to the Agreement'
iv. [Notify] the telephone company and all listing agencies, including classified and other directory listings, of the termination of the Defendants' right to use any Ledo Pizza trademark or trade dress;
v. [Authorize] the telephone company and all listing agencies to transfer all telephone numbers and directory listings to Ledo Pizza system;
vi. [Remove] all signs and other interior and exterior decor associated with Ledo Pizza System's trademark or trade dress; and
vii. [Cease] the use of trade secrets developed by the Plaintiffs[.]

ECF No. 4 at 14.

however, specify any threat of irreparable harm from defendant's failure to immediately change the store's phone number, change the location's decor, or return Ledo's operating manuals, when the defendant ceases operations as a Ledo Pizza store. Moreover, many of Ledo's requests, particularly modifying the physical interior and exterior of the restaurant, will likely result in some expense to the defendant. The hardship to the defendant of awarding mandatory relief now may outweigh the hardship to Ledo when the defendant's business stops operating. Thus, given that the injunctive relief that will be ordered remedies the primary source of the injury to Ledo--the defendant's continued operation of the restaurant--Ledo likely has not met its heightened burden to justify the award of a mandatory injunction now.

III. Conclusion

In conclusion, the Court will grant Ledo's request for a TRO enjoining the defendant from further infringement of the Ledo trademark. The Court will deny Ledo's requests for relief on its breach of contract claims.

10/10/13
Date

William D. Quarles, Jr.
United States District Judge