IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

LEDO PIZZA SYSTEM, INC.,            *
et al.,                             *

      Plaintiffs,                *

          v.                  *    CIVIL NO.: WDQ-13-2365

INDERJIT SINGH, et al.,             *

      Defendants.                *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

MEMORANDUM OPINION

    Ledo Pizza System, Inc. and Ledo Pizza Carryouts, Ltd.
(together "Ledo") sued Tri-Bro, Inc. ("Tri-Bro") and Inderjit
Singh for violations of the Lanham Act, and other claims.  ECF
No. 1.  Pending is Ledo's motion for a preliminary injunction.
ECF No. 2.  On October 22, 2013, the Court held a hearing on the
motion; no defendant opposed the motion or appeared at the
hearing.  See Fed. R. Civ. P. 65(a).  For the following reasons,
Ledo's motion will be granted in part and denied in part.

I.  Background[1]

    On June 8, 2007, Ledo and Singh signed a franchise agreement,
which authorized Singh to operate a Ledo pizza restaurant in

---

[1] The facts are taken from the hearing and the evidence admitted
at the hearing.

Lorton, Virginia. ECF No. 1-2.[2] The same day, Singh signed an agreement sub-licensing the franchise to Tri-Bro so that Tri-Bro could serve as its operating company. ECF No. 1-3.[3] Beginning in 2010, the defendants defaulted on several of their obligations under the agreements. ECF No. 1-4.[4] According to Ledo, the defendants now owe Ledo $51,052.76 in overdue franchise and other fees. Ex. 7.[5] On May 14, 2012, Ledo terminated the franchise agreement. ECF No. 1-5.[6]

On May 31, 2012, Ledo and the defendants entered into a forbearance agreement. ECF No. 1-6.[7] Under this agreement, Ledo refrained from exercising its post-termination rights under the franchise agreement to give the defendants an opportunity to sell the franchise or dispose of its assets. *Id.* at 1.

---

[2] At the hearing, the franchise agreement was admitted into evidence as Exhibit 1.

[3] At the hearing, the sub-license agreement was admitted into evidence as Exhibit 2.

[4] At the hearing, the notice of default was admitted into evidence as Exhibit 3. James Beall, Ledo's President, testified that the defaults began in 2010.

[5] Exhibit 7, which contains a detailed list of all overdue fees owed to Ledo by Singh, was admitted into evidence at the hearing.

[6] At the hearing, the notice of termination of the franchise agreement was admitted into evidence as Exhibit 4.

[7] At the hearing, the forbearance agreement was admitted into evidence as Exhibit 5.

Although this agreement expired on November 1, 2012, *id.*, Ledo agreed in June 2013 to extend the forbearance period to July 31, 2013. ECF No. 1-7.[8] Beall testified that the defendants continued to operate the franchise following the termination of the franchise agreement and after the forbearance periods.

On August 14, 2013, Ledo filed a verified complaint against Singh and Tri-Bro alleging breach of contract, various violations of the Lanham Act, unfair competition, and common law trademark infringement. ECF No. 1. The same day, Ledo moved for a temporary restraining order ("TRO") and a preliminary injunction. ECF No. 2. On August 15, 2013, Ledo filed an amended complaint, which noted that Tri-Bro had filed for bankruptcy. ECF No. 4. Both defendants were served on August 19, 2013. ECF Nos. 7, 8.

Ledo seeks to enjoin the defendants from further use of Ledo's trademark and trade dress, allegedly in violation of the Lanham Act and Ledo's common law trademark rights. ECF No. 2. at 6. Ledo also seeks the defendants' compliance with the post-termination obligations in the franchise agreement,[9] *id.* at 8, and the agreement's covenant-not-to-compete, *id.* at 12-13.[10]

---

[8] At the hearing, the amended forbearance agreement was admitted into evidence as Exhibit 6.

[9] The agreement states that the obligations arise "[u]pon termination or expiration of the franchise for any reason whatsoever." ECF No. 1-2 at 21. These obligations, which

3

The amended complaint seeks a permanent injunction, *see e.g.*, ECF No. 4 at 17, and specific performance, ECF No. 4 at 12-15. Ledo also requests damages for breach of contract[11] and costs and attorneys' fees against defendant Singh only, because Tri-Bro has declared bankruptcy.[12] *See id.* at 2, 12. The Court held a telephone conference with the parties on August 22, 2013, during which counsel for Tri-Bro confirmed that the company had filed for Chapter 11 Bankruptcy protection. The Court instructed counsel for both defendants to file their responses to Ledo's motion by mid-day August 26, 2013. Only Tri-Bro's counsel responded and, by letter, declined to file a response to

---

require affirmative acts, include returning all copies of Ledo's operating manuals, assigning the restaurant's phone numbers to Ledo, and modifying the interior of the restaurant to no longer reflect the color schemes or appearance of Ledo restaurants. *Id.* at 21.

[10] The covenant is effective upon Ledo's termination of the franchise agreement, whether or not that termination is in accord with the agreement. *See* ECF No. 1-2 at 25. The covenant prohibits the defendants from engaging in "any dine in or carry-out food products business" within ten miles of the defendant's Ledo pizza franchise location for two years. *Id.*

[11] Ledo's evidence establishes that the defendants owe $51,052.76 in unpaid advertising and royalty fees under the franchise agreement. ECF No. 1-4, Ex. 7. The franchise agreement also provides for $100,000 in liquidated damages for breach of the covenant-not-to-compete. ECF No. 1-2 at 25.

[12] The franchise agreement requires the defendants to pay Ledo's costs and reasonable attorney's fees, "in enforcing its rights" under the franchise or any other agreement with Singh. ECF No. 1-2 at 28. The complaint seeks attorneys' fees for all claims. *See, e.g.*, ECF No. 4 at 16-17.

4

the motion because Ledo no longer sought damages against Tri-Bro.  ECF No. 10.

On August 30, 2013, the parties jointly stipulated to entry of a consent order that gave the defendants 30 days to wind down the business, after which the Court would order dismissal of the action or grant injunctive relief depending on whether the defendants had complied with the agreement.  *See* ECF No. 11 at 6-9.  On September 4, 2013, the Court informed the parties that, given its concern that the defendants would not have sufficient time to wind down the business, it would not enter the consent order.  ECF No. 12.  Instead, the Court would treat the consent order as a tentative settlement and request to stay the litigation.  *Id.*

On October 7, 2013, Ledo renewed its request for injunctive relief, because Singh had not complied with the consent order.[13] ECF No. 13 at 5.  On October 10, 2013, the Court granted Ledo's request for a TRO against Singh only on Ledo's trademark infringement claims; it otherwise denied Ledo's requested relief.[14]  ECF No. 14.  The Court also stayed Ledo's suit against Tri-Bro, because of its bankruptcy filing.  *Id.*  On October 16,

---

[13] Ledo also requested entry of a default judgment.  ECF No. 13 at 5.  On October 15, 2013, on Ledo's motion, the Clerk entered a default against Singh.  ECF No. 17.

[14] On October 11, 2013, Ledo posted a $100,000 bond.

2013, Ledo moved for sanctions and a contempt order against Singh, because Singh continued to operate the Ledo franchise after the entry of the TRO.[15] *See* ECF No. 18.[16]

On October 22, 2013, the Court held a hearing on Ledo's motion for a preliminary injunction. Singh did not appear. James Beall, Ledo's President, testified. Beall described how Singh became a Ledo pizza franchisee and the subsequent deterioration of Singh's business relationship with Ledo. Beall testified about the assistance he gave Singh to attempt to help him to resolve the franchise's financial difficulties,[17] which included overdue fees to Ledo, late rent payments to Singh's landlord, and back payroll and sales taxes owed to the State of Virginia. When it became clear to Beall that Singh could no longer operate as a successful Ledo franchisee, given the extent of his defaults under the franchise agreement, he advised Singh

---

[15] Beall testified that Singh stopped operating the franchise as a Ledo pizza on October 14, 2013 and reopened on October 19, 2013 as a Stallion pizza franchise. Charles H. Henderson, Esquire, averred that he called the franchise on October 15, 2013 and an employee answered by stating "Ledo Pizza of Lorton, how can I help you." ECF No. 18-5. Thus, Singh's Ledo franchise was likely operated until at least October 14, 2013-- four days after the Court entered the TRO. ECF No. 14.

[16] Singh's response time for the motion expires on November 4, 2013. If Singh does not respond by the deadline, the Court will order Singh to show cause why he should not be held in civil contempt for violating the TRO.

[17] Among other assistance, Beall reviewed the store's sales records and alerted Singh to the possibility that an employee was stealing money from the store's cash register.

to sell the franchise and located several potential buyers--
current Ledo franchisees looking to open additional franchise
locations. Singh refused to consider these buyers' offers.
This led Ledo to terminate its franchise agreement with Singh.

During the forbearance periods that followed, Singh again
rejected Beall's suggested buyers' offers for the franchise.
Singh finally accepted an offer from his general manager. To
allow them to close the deal, Ledo agreed to a 30-day winding up
period, which was formalized in the stipulated consent order
submitted to this Court. That deal was not completed because
the landlord refused to accept the buyer.

Beall testified that after the Court granted Ledo's request
for a TRO prohibiting Singh from further infringement of the
Ledo trademark, Singh continued to operate as a Ledo pizza until
October 14, 2013. Singh then closed the restaurant until
October 19, 2013, when he reopened as a Stallion pizza--a
different franchise. Beall did not authorize Singh to reopen as
a competing pizza franchise. Singh continues to use Ledo's
proprietary software system to manage his sales, he uses the
same décor and floor plan in his new restaurant that he used in

the Ledo restaurant,[18] he sells some food made using Ledo's recipes,[19] and he retains possession of Ledo's operating manuals.

Beall testified that Singh's unauthorized change from a Ledo pizza restaurant to a Stallion pizza restaurant has harmed Ledo in several ways. Customers have complained to Ledo that they are confused by the franchise change--this confusion devalues the Ledo brand and harms the surrounding Ledo franchisees.[20] The change harms Ledo's relationship with Singh's landlord, who is also the landlord for several other Ledo franchisees, and vendors. Other franchisees are aware of Singh's actions[21] and may be led to violate their own franchise agreements, thus threatening harm to the whole Ledo pizza franchise system. Ledo no longer has control over the franchise's operations, and some customers may believe they are still patronizing a Ledo franchise.[22] Finally, Singh's actions

---

[18] Beall testified that Ledo helped Singh design the floor plan and interior décor of the restaurant and that Singh chose to use the standard Ledo restaurant design.

[19] Singh no longer sells pizza made from Ledo's recipe, however.

[20] For example, Singh's sales have declined dramatically since his new restaurant opened.

[21] Beall testified that Ledo, and about 85% of Ledo's franchisees, are members of a Facebook group and have discussed this litigation on the group's wall.

[22] The new Stallion franchise has the same phone number as the former Ledo franchise, and Singh may not have removed all Ledo branding and distinctive trade dress. Also, Ledo is usually

may cause prospective franchisees to hesitate to open a Ledo franchise out of concern that Ledo is having trouble managing its relationship with its current and past franchisees.

II. Analysis

A. Request for Injunction Against Tri-Bro

At the hearing, Ledo renewed its request for injunctive relief against Tri-Bro, which has filed for bankruptcy. In support, Ledo argued that Maryland courts have not settled the question of the applicability of the bankruptcy automatic stay to injunctive relief.[23] Because the Court previously held that Ledo could not seek injunctive relief against Tri-Bro because of the automatic stay, *see* ECF No. 14 at 5-6, the Court construes this request as a motion for reconsideration.

A party may seek relief from a judgment or order under Rule 60(b). *See* Fed. R. Civ. P. 60(b). Rule 60(b) permits the Court to amend a final judgment, order, or proceeding because of: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation, or misconduct by an opposing party; (4) a void judgment; (5) satisfaction,

---

able to reopen closed franchises under new ownership. Thus, any Stallion sales are lost sales for Ledo.

[23] Under 11 U.S.C. § 362(a)(1), a bankruptcy petition "operates as a stay . . . of . . . the commencement or continuation . . . of a judicial . . . action or proceeding against the debtor that was or could have been commenced before the commencement of the [bankruptcy proceeding.]"

release, or discharge of a judgment; or (6) any other reason justifying relief. *Id.*

A motion to reconsider is appropriate to raise a significant change in the law or facts, or when "the Court has patently misunderstood a party, or has made a decision outside the adversarial issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Above the Belt, Inc. v. Mel Bohannan Roofing, Inc.*, 99 F.R.D. 99, 101 (E.D. Va. 1983). "A motion to reconsider is inappropriate where it merely seeks to re-debate the merits of a particular motion," *Remediation Products, Inc. v. Adventus Americas, Inc.*, 3:07CV153-RJC-DCK, 2010 WL 2572555, at *1 (W.D.N.C. June 22, 2010), or merely request that the district court change its mind, *United States v. Williams,* 674 F.2d 310, 313 (4th Cir. 1982).[24]

Ledo essentially argues that the Court should reconsider its holding, because it could have reached a different conclusion. Ledo's request that the Court change its mind is insufficient to support a motion to reconsider. *See Williams,* 674 F.2d at 313. Accordingly, Ledo's motion will be denied and Ledo's suit against Tri-Bro remains stayed.

---

[24] *See also Pritchard v. Wal Mart Stores, Inc.*, 3 F. App'x 52, 53 (4th Cir. 2001); *Medlock v. Rumsfeld,* 336 F. Supp. 2d 452, 470 (D. Md. 2002); *Erskine v. Bd. of Educ.*, 207 F. Supp. 2d 407, 408 (D. Md. 2002).

B. Preliminary Injunction Standard

A preliminary injunction is an "extraordinary remed[y] involving the exercise of very far-reaching power to be granted only sparingly and in limited circumstances." *MicroStrategy Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (internal quotation marks omitted). Because issuing a preliminary injunction "requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way," "[t]he danger of a mistake in this setting is substantial." *Hughes Network Sys., Inc. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (internal quotation marks omitted).

To obtain a preliminary injunction, the movant must demonstrate that: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm absent preliminary relief; (3) the balance of equities favors him; and (4) an injunction is in the public interest.[25] The movant must show more than a "grave or serious question for litigation"; instead, he bears the "heavy burden" of making a "clear showing that [he] is

---

[25] *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371, *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam).

likely to succeed at trial on the merits." *Real Truth*, 575 F.3d at 347, 351. All four elements must be present. *Id.* at 346.

C. Lanham Act Trademark Infringement

1. Likelihood of Success on the Merits

To prevail on its Lanham Act claims, Ledo must show that it "has a valid, protect[a]ble trademark" and that Singh's "use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 (4th Cir. 1995) (*citing* 15 U.S.C. § 1141(1)). In a directly analogous case involving a terminated pizza franchise agreement, the court held that a franchisee's continued use of a franchisor's trademarks following the termination of the agreement was likely to cause confusion among consumers. *See Prosperity Systems, Inc. v. Ali*, CIV. CCB-10-2024, 2010 WL 5174939, at *2 (D. Md. Dec. 15, 2010) (*citing Merry Maids Ltd. P'ship v. Kamara*, 33 F. Supp. 2d 443, 445 (D. Md. 1998)). In this context it is probable that consumers will be misled or confused "as to the source of the goods in question." *See Ohio Learning Ctrs., LLC v. Sylvan Learning, Inc.*, CIV.A. RDB-10-1932, 2012 WL 1067668, at *10 (D. Md. Mar. 27, 2012).[26]

---

[26] *See also Anheuser-Busch, Inc. v. L. & L. Wings, Inc.*, 962 F.2d 316, 318 (4th Cir. 1992)("[A]n unauthorized use of a trademark infringes the trademark holder's rights if it is likely to

12

Beall testified that Ledo owns the trademark "Ledo Pizza,"

and that Singh used Ledo's actual trademark without permission,

not a "colorable imitation." Beall also asserted that customers

are confused about Singh's franchise's status and have

complained to Ledo about the franchise. Ledo has established

its likelihood of success on the merits.

2. Irreparable Harm

Ledo argues that it has suffered irreparable harm from

Singh's infringement of its trademark rights. ECF No. 2-1 at 6-

7. A finding of irreparable harm usually follows a finding of

unlawful use of a trademark and a likelihood of confusion.[27]

Beall testified that Singh's unauthorized use of Ledo's

trademark and trade dress harmed Ledo's relationship with

customers and other franchisees. Ledo can no longer control the

quality of products and services at Singh's restaurant because

---

confuse an 'ordinary consumer' as to the source or sponsorship
of the goods.").

[27] *See Prosperity Systems*, 2010 WL 5174939, at *5; *Merry Maids*,
33 F. Supp. 2d at 445. In the franchise context, multiple cases
note that the franchisor loses control of its business
reputation and suffers irreparable harm when a terminated
franchisee continues to operate its former franchise. *See Merry
Maids*, 33 F. Supp. 2d at 445 (*citing Long John Silver's, Inc. v.
Washington Franchise, Inc.*, 1980 U.S. Dist. LEXIS 16635, at *12
(E.D. Va. June 24, 1980)). Irreparable harm may also arise in
the franchise context "where there is an inherent injury to the
goodwill and reputation of the plaintiff" resulting from the
"[v]iolation of a trademark." *See NaturaLawn of Am., Inc. v. W.
Grp., LLC*, 484 F. Supp. 2d 392, 401 (D. Md. 2007) (finding that
former franchisees' continued use of the franchisor's trademark,
trade secrets, and customer lists qualified as inherent injury).

of the termination of the franchise agreement, and this injury
continues even after Singh reopened as a Stallion franchise,
because many customers still associate the restaurant location
with Ledo. Beall also asserts that Singh's restaurant, which is
still using Ledo's proprietary software systems, trade dress,
and recipes, is diverting customers from Ledo franchises,
decreasing Ledo's profits. This loss of control of Singh's
restaurant, the threat to Ledo's reputation and goodwill with
customers and other franchisees, and the loss of profits are
irreparable harm. *See, e.g.*, *Merry Maids*, 33 F. Supp. 2d at
445.

   3. Balance of Equities

   Ledo argues that the balance of equities favors it, because
"[t]he potential harm to the Defendants in granting [this
motion] . . . is relatively minimal" compared to the harm Ledo
has suffered by Singh's infringement. ECF No. 2-1 at 7.
Although several analogous cases conclude that the balance of
equities generally favors the franchisor, some of these cases
also recognized that the former franchisees suffer great harm
from the closure of their businesses. *See NaturaLawn*, 484 F.
Supp. 2d at 403; *Prosperity*, 2010 WL 5174939, at *5. However,

when the defendant's "hardships have been created by their own willful acts," the balance favors the plaintiffs.[28]

Here, any hardship caused to Singh by a preliminary injunction is self-inflicted. Beall testified that he attempted to work with Singh to cure the franchise's defaults before Ledo legally terminated the franchise. He also testified that he attempted to help Singh find a buyer for the franchise so Singh could recoup some of his losses. Before the termination went into effect, Ledo granted Singh several extensions of time to find a buyer for the franchise or its assets. *See, e.g.*, ECF No. 11. Accordingly, the balance of equities tips in Ledo's favor, despite any economic hardship Singh may suffer.

4. Public Interest

Ledo argues that the public "has a strong interest in the protection of trademarks," justifying the injunction. ECF No. 2-1 at 8. Several cases in this district emphasize the public interest in enforcement of trademark rights, particularly noting that the public has a strong interest in avoiding consumer confusion "'about the identity of the enterprise from which goods and services are purchased.'" *See Prosperity*, 2010 WL

---

[28] *See NaturaLawn*, 484 F. Supp. 2d at 403; *Meineke Car Care Centers, Inc. v. Bica*, 3:11-CV-369-FDW-DCK, 2011 WL 4829420, at *4 (W.D.N.C. Oct. 12, 2011)(*citing S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 379 (3d Cir. 1992) ("[Franchisee] is certainly harmed by the threat of loss of his franchise, but his self-inflicted harm is far outweighed by the immeasurable damage done Jiffy Lube by the infringement of its trademark.")).

5174939, at *6 (*quoting Toolchex, Inc. v. Trainor*, 634 F. Supp. 2d 586, 594 (E.D. Va. 2008)); *Merry Maids*, 33 F. Supp. 2d at 446. Because Ledo seeks to protect its trademark rights, and so avoid consumer confusion, the public interest favors granting Ledo relief. *See Merry Maids*, 33 F. Supp. 2d at 446.

    5. Ledo's Other Trademark Claims

    Ledo also asserts common law trademark infringement claims. *See* ECF No. 2-1 at 6-8. Because Ledo satisfies the requirements for a preliminary injunction on its Lanham Act claims, granting this injunction, which prohibits further infringement of Ledo's trademark by Singh, will also protect Ledo's common law trademark rights.

    D. Contractual Claims

    Ledo is likely to establish that: (1) Ledo and Singh entered into a valid contract, the franchise agreement;[29] (2) the franchise agreement was terminated;[30] and (3) the termination of the agreement obliges Singh to comply with all post-termination obligations, including the covenant-not-to-compete.[31]

---

[29] *See* ECF No. 1-2.

[30] On May 11, 2012, Ledo sent a Notice of Termination letter to the defendants. ECF No. 1-5. This letter followed a Notice of Default letter which detailed the defendants' outstanding financial obligations to Ledo under the franchise agreement. ECF No. 1-4. Beall testified that the defendants owe Ledo $51,052.76. Ex. 7.

[31] *See* ECF No. 1-2 at 21-22, 25.

### 1. Choice of Law

As a preliminary matter, the Court must determine what state's law governs Ledo's contract claims that arise from the franchise agreement's termination. Here, the franchise agreement provides that, "this Agreement . . . is governed by the laws of the State of Maryland." ECF No. 1-2 at 29. Under Maryland law,[32] this Court should presume that a parties' choice of law is enforceable. *See Meena Enters., Inc. v. Mail Boxes Etc.*, No. DKC 12-1360, 2012 WL 4863695, at *6 n.8 (D. Md. Oct. 11, 2012) (internal quotation marks omitted). Thus, Maryland law governs the enforceability and construction of the franchise agreement.

### 2. The Covenant-not-to-Compete

#### a. Likelihood of Success on the Merits

Ledo asserts that the covenant-not-to-compete triggers upon the termination of the franchise agreement. ECF No. 2-1 at 13. It also argues that the covenant will be enforceable, because the "two year, ten mile restriction" is "reasonable" and "analogous" to other covenants enforced by courts in this district. *Id.*

---

[32] A federal court exercising diversity jurisdiction must apply the choice-of-law principles of the state in which the federal court is located. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

17

Under Maryland law, a non-compete provision is enforceable "if the restraint is confined within limits which are no wider as to area and duration than are reasonably necessary for the protection of the business of the employer and do not impose undue hardship on the employee or disregard the interests of the public." *Becker v. Bailey*, 268 Md. 93, 96, 299 A.2d 835, 838 (1973). If the scope of the covenant on its face is reasonable, then the court will examine the facts and circumstances of the individual case. *See Millward v. Gerstung Int'l Sport Ed., Inc.*, 268 Md. 483, 487, 302 A.2d 14, 16 (1973).

In *Budget Rent A Car of Washington, Inc. v. Raab*, 268 Md. 478, 482, 302 A.2d 11, 13 (1973), the Court of Appeals of Maryland applied this standard in the franchise context and found the following considerations particularly relevant:

> whether the person sought to be enjoined is an unskilled worker whose services are not unique; whether the covenant is necessary to prevent the solicitation of customers or the use of trade secrets, assigned routes, or private customer lists; whether there is any exploitation of personal contacts between the employee and customer; and, whether enforcement of the clause would impose an undue hardship on the employee or disregard the interests of the public.

In *Budget*, the court found that a non-compete clause which prohibited the operation of a car rental business in Bethesda for two years was facially reasonable, but declined to enforce it because, *inter alia*, the defendant was not infringing any of Budget's intellectual property or trade secrets rights. *See id.*

18

at 478, 482. Similarly, in *NaturaLawn*, a non-compete provision prohibited the former franchisees from operating a lawn care business within 20 miles of a NaturaLawn franchise for two years following the termination of the agreement. *See* 484 F. Supp. 2d at 396, 401. The court held that this covenant was reasonable under Maryland law, because the scope of the prohibition only extended to the "same type of business that the defendants operated as franchisees." *See id.* at 400. The court also noted that "a term of two years is a reasonable time period for the restriction under Maryland law." *Id.* (*citing Budget*, 268 Md. at 481-82, 302 A.2d at 13).[33]

Ledo seeks enforcement of the franchise agreement's two year non-compete provision which prohibits operation of a dine in or carry-out restaurant within ten miles of Singh's Ledo pizza location. ECF Nos. 1-2 at 25, 2-1 at 13. This covenant has a similar geographic and durational scope to the non-compete provisions in the franchise cases cited above, and thus appears reasonable on its face. *See Millward*, 268 Md. at 484, 489, 302 A.2d at 15, 17 (finding a two year employment non-compete that

---

[33] *See also Ohio Learning,* 2012 WL 1067668, at *12 (holding that a two-year, five mile non-compete provision in a franchise agreement was reasonable under Maryland law and noting that "this Court has previously upheld [provisions] imposing far broader, or even unlimited geographic limitations"); *Prosperity*, 2010 WL 5174939, at *3 (finding that a one-year, 20 mile non-compete provision had "limited time, scope, and geography" and "may well be enforceable under Maryland law").

applied in "the City of Baltimore and surrounding counties" facially reasonable). The provision is also limited to the type of business that Singh operated as a Ledo franchisee. *See NaturaLawn*, 484 F. Supp. 2d at 400. Although like the defendant in *Budget*, Singh has ceased operating a Ledo pizza store, unlike the defendant in *Budget*, Singh is actively soliciting Ledo customers and using Ledo trade secrets, including some of its recipes. *See Budget*, 268 Md. at 480-82, 302 A.2d at 12-13. Also, unlike the defendant in *Budget*, Singh is a skilled worker--according to Beall, Ledo gave Singh extensive training on how to run a Ledo pizza franchise. *See id.* at 482, 13. Accordingly, the factual considerations that compelled the Maryland court to deny injunctive relief in *Budget* are not present in this case. Ledo is likely to succeed on the merits of its claim that the covenant-not-to-compete is an enforceable obligation of Singh.

### b. Irreparable Harm

Ledo asserts that Singh's continued operation of a pizza restaurant, in violation of the non-compete, has caused, and will continue to cause, irreparable harm to it. ECF No. 2-1 at 14-15. Courts in this district have held that a former franchisee's operation of a similar or the same business following termination of the franchise agreement results in irreparable harm to the franchisor. *See NaturaLawn*, 484 F.

Supp. 2d at 402-03 (finding irreparable harm when former franchisees "directly compet[ed] with the plaintiff") (*citing ATL Int'l, Inc. v. Baradar,* Bus. Franchise Guide (CCH) 11, 345 *402 (D. Md. 1997)(Motz, J.)(oral ruling, not officially reported)); *Meineke*, 2011 WL 4829420, at *5 (finding violation of non-compete caused irreparable harm, because of the inevitable damage to franchisor's "goodwill and reputation with customers"); *Merry Maids*, 33 F. Supp. 2d at 445.

Beall testified that Singh's operation as a Stallion pizza restaurant in the same location as its former Ledo franchise threatens Ledo's "good will and reputation," with Ledo's customers, current and prospective franchisees, and vendors, as well as Singh's landlord. *See Merry Maids*, 33 F. Supp. 2d at 445. Also, Beall asserted that Singh's actions are likely to signal to other franchisees that they can violate their franchise agreements without consequence. Finally, Beall testified that Singh's continued operation diverts profits from Ledo. These facts establish irreparable harm from Singh's breach of the non-compete. *See, e.g.*, *Meineke*, 2011 WL 4829420, at *5.

### c. Balance of Equities

Ledo argues that the irreparable harm it suffers from Singh's breach of the non-compete provision tips the balance of equities in its favor. ECF No. 2-1 at 12. As in the trademark

infringement context, multiple cases hold that the balance of equities favors the franchisor plaintiff when the defendant has willfully violated a franchise agreement's non-compete provision. *NaturaLawn*, 484 F. Supp. 2d at 402; *Meineke*, 2011 WL 4829420, at *4. At least one court, however, has held that the balance of equities favors the defendant franchisee when enforcement of the non-compete provision according to its terms will cause substantial harm to the defendant. *Prosperity Systems*, 2010 WL 5174939, at *5 (finding that substantial economic harm to franchisee resulting from prohibition against operating a pizza restaurant in his own name outweighed harm to franchisor, when defendant likely had established "his own good will with customers" after operating for many years).

Here, as in *Prosperity Systems*, enforcing the terms of the non-compete will likely cause Singh economic harm. However, Ledo has shown that it made several attempts to assist Singh in avoiding at least some of that harm. Beall worked with Singh extensively to cure the franchise's defaults, even alerting Singh to possible employee thefts. After Beall realized that Ledo needed to terminate Singh's franchise, Beall found several buyers for the franchise, all of which Singh rejected. Ledo also delayed the termination of the agreement several times to allow Singh time to find another acceptable buyer. *See, e.g.*, ECF No. 11. Therefore, the harm to Ledo from Singh's operation

of a pizza business at his former Ledo franchise location outweighs any harm to Singh.[34]

### d. Public Interest

Ledo argues that "[t]he public interest favors requiring parties to abide by the terms of their contracts . . . ." ECF No. 2-1 at 16. Several cases express agreement with Ledo on this point. *NaturaLawn*, 484 F. Supp. 2d at 404 ("It is in the public interest to . . . enforce valid contracts."); *Merry Maids*, 33 F. Supp. 2d at 446. Accordingly, the Court will grant Ledo preliminary injunctive relief to enforce the covenant-not-to-compete.

### 3. Defendants' Post-Termination Obligations

### a. Standard

Ledo seeks Singh's compliance with several contractual obligations that arose out of the termination of the franchise agreement, which require Singh's affirmative action.[35]

---

[34] *See NaturaLawn*, 484 F. Supp. 2d at 403 (finding that balance of equities favored enforcement of non-compete, because defendants rejected options that would have avoided their economic hardships and instead "chose to ignore altogether their obligations under the Franchise Agreements . . . thereby 'rolling the dice' that injunctive judicial relief would permit them to continue their evident wrongdoing during the pendency of the case").

[35] Ledo requests that the Court enjoin Singh to:

> [i. Return] all copies of the Ledo Pizza Operating
> Manual;

23

"Ordinarily, preliminary injunctions are issued to protect
the status quo and to prevent irreparable harm during the
pendency of a lawsuit ultimately to preserve the court's ability
to render a meaningful judgment on the merits." *Perry v. Judd*,
471 F. App'x 219, 223 (4th Cir. 2012) (internal quotation marks
omitted). "[M]andatory preliminary injunctive relief in any
circumstance is disfavored, and warranted only in the most
extraordinary circumstances." *Id.* (internal quotation marks
omitted).

b. Irreparable Harm and Balance of Equities

Beall testified that Singh has ceased operating as a Ledo
pizza store and is now operating as a Stallion pizza. He stated
that the interior décor of the restaurant has not changed but
was unsure whether Singh has removed all exterior signs with
Ledo's name. He did note that Singh has put a sign on the

[ii. Cancel] all assumed names or equivalent
     registrations relating to the use of any mark
     used pursuant to the Agreement'
[iii. Notify] the telephone company and all listing
     agencies, including classified and other
     directory listings, of the termination of the
     Defendants' right to use any Ledo Pizza trademark
     or trade dress;
[iv. Authorize] the telephone company and all listing
     agencies to transfer all telephone numbers and
     directory listings to Ledo Pizza System; [and]
[v.  Remove] all signs and other interior and exterior
     decor associated with Ledo Pizza System's
     trademark or trade dress[.]

ECF No. 4 at 14.

24

store's window alerting customers to the franchise change and is selling food as a Stallion franchise, although Singh is still selling some food made using Ledo's recipes. Beall testified that the Ledo brand is harmed when customers see a closed Ledo franchise location, but he did not identify any harm that would result from a closed Stallion franchise at this former Ledo location. He also did not specify any irreparable harm from Singh's failure to immediately change the store's phone number, change the location's interior décor, or return Ledo's operating manuals, after Singh ceases operations as a Stallion pizza. Moreover, many of Ledo's requests, particularly modifying the physical interior of the restaurant, will likely result in some expense to Singh. The hardship to Singh of awarding mandatory relief now may outweigh the hardship to Ledo when Singh's business stops operating. Thus, given that the injunctive relief that will be ordered remedies the primary source of the injury to Ledo--Singh's continued operation of a pizza restaurant in his former franchise location--Ledo has not met its heightened burden to justify the award of a mandatory preliminary injunction.

III. Conclusion

For the reasons stated above, the Court will grant Ledo's motion for a preliminary injunction prohibiting Singh from infringing Ledo's trademark and from further violation of the

non-compete.  The Court will otherwise deny Ledo's requests for
relief.

_10/24/13_
Date

William D. Quarles, Jr.
United States District Judge